UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------x
CHARMAINE FRASER,

                  Plaintiff,            **MEMORANDUM AND ORDER**

      -against-

                                         14-CV-7222 (KAM)(CLP)
MTA LONG ISLAND RAIL ROAD,

                  defendant.
----------------------------------x
**MATSUMOTO, United States District Judge:**

This is the second of two actions brought by plaintiff Charmaine Fraser ("plaintiff") against her employer, defendant MTA Long Island Rail Road ("LIRR" or "defendant"). The first action — *Fraser v. MTA Long Island Rail Road*, No. 12-CV-5778 (SLT)(CLP) (hereafter, *Fraser I*) — alleged gender discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended ("Title VII"), the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.* (the "NYSHRL"), and the New York City Human Rights Law, N.Y. City Admin. Code § 8-101 *et seq.* (the "NYCHRL"), as well as violations of the Equal Pay Act of 1963, 29 U.S.C. § 206(d) (the "EPA") and the New York State Equal Pay Law, N.Y. Labor Law § 194 (the "NYEPL"). In a memorandum and order dated March 31, 2018, the court granted defendant's motion for summary judgment with respect to the Title VII, NYSHRL and EPA claims. The court declined to exercise supplemental jurisdiction over the two

causes of action brought under the NYEPL and NYCHRL, which were dismissed without prejudice to pursuing them in State court.

In this second action, plaintiff brings additional retaliation claims under Title VII, the NYSHRL and the NYCHRL, alleging that defendant retaliated against her by rejecting five job applications she made to the LIRR between July 2012 and July 2014. Defendant now moves for summary judgment, arguing that the claims relating to the first two rejections are time-barred and that plaintiff cannot establish a claim for retaliation with respect to the other three rejections. For the reasons set forth below, the court grants defendants' motion with respect to plaintiff's Title VII and NYSHRL retaliation claims, and declines to exercise jurisdiction over plaintiff's NYCHRL retaliation claim.

## BACKGROUND

Unless otherwise stated, the following facts are either not in dispute, taken from plaintiff's own version of events, or taken from documents provided by counsel. Plaintiff is an African-American woman who was born in March 1978. (Declaration of Saul D. Zabell in Opposition to defendant's Motion for Summary Judgment ("Zabell Declaration"), Ex. 2, p. 4; Declaration of Kevin P. McCaffrey in Support of Motion for Summary Judgment ("McCaffrey Declaration"), Ex. D, p. 4.) In May 2000, at age 23, she was hired by the LIRR as an Assistant Conductor. (Defendant's Rule

56.1 Statement ("Def. 56.1"), ¶ 1; Plaintiff's Rule 56.1 Counterstatement of Material Facts in Dispute ("Pl. 56.1"), ¶ 1.) She became an Assistant Station Master in 2001, and became the Acting General Station Master in or around December 2008. (Def. 56.1, ¶ 2; Pl. 56.1, ¶¶ 2-3.) In February 2009, plaintiff was appointed to the position of General Station Master. (Def. 56.1, ¶ 3; Pl. 56.1, ¶ 3.)

On January 27, 2012, plaintiff filed a charge of discrimination (the "Charge") with the New York State Division of Human Rights (the "SDHR"), alleging that defendant and several of its employees had discriminated against her on account of her gender and other protected characteristics. (Def. 56.1, ¶ 6; Pl. 56.1, ¶ 6.) The Charge, which is attached to the Zabell Declaration as Exhibit 2 and attached to the McCaffrey Declaration as Exhibit D, consists of a completed form (the "Form") and a four-page narrative (the "Narrative"). The allegations in the Charge and the incidents which gave rise to it were discussed at length in *Fraser I*, and need not be repeated here. For purposes of this action, the court notes only that plaintiff checked a box on the form to allege "Retaliation," but that Narrative did not allege facts suggesting a Title VII retaliation claim.

In late April 2012, about four months after plaintiff filed the Charge, plaintiff was removed from her position as General Station Master and involuntarily reassigned to a position

as Manager Hours of Service.  (Def. 56.1, ¶ 15; Pl. 56.1, ¶ 15.)
Plaintiff was apprised of this reassignment in an April 24, 2012,
letter authored by J. Rod Brooks, the LIRR's Chief Transportation
Officer.  That letter — which is attached to the Zabell
Declaration as Exhibit 19 and attached to the McCaffrey
Declaration as Exhibit E — described various instances in which
plaintiff's "performance, behavior and leadership skills" were
deemed "less than acceptable for the position" of General Station
Master.  (*Id.*)  The letter also informed plaintiff that she was
being placed on a "Performance Improvement Plan" ("PIP"), under
which her job performance was to be monitored and reassessed after
six months.  (*Id.*; Def. 56.1, ¶ 16; Pl. 56.1, ¶ 16.)

**The First Two Job Applications**

Over the next six months, plaintiff applied for two
other positions within the LIRR's Transportation Services
Department.  On or about July 7, 2012, she applied for a position
as a Lead Transportation Manager ("LTM".)  (Def. 56.1, ¶ 22; Pl.
56.1, ¶ 22.)  On September 27, 2012, she applied for the position
of Manager of Customer Service and Terminal Operations.  (Def.
56.1, ¶ 53; Pl. 56.1, ¶ 53.)

On September 28, 2012, Tracy Hessel-Andor, the Human
Resources Business Manager responsible for filling the LTM
position, wrote to plaintiff, informing her that she would not be
offered an interview.  (Def. 56.1, ¶ 21; Pl. 56.1, ¶ 21.)  Hessel-

Andor's note asserted that plaintiff did not meet "the requirements listed in the bulletin" because she had not been in her current position "for 12 months immediately preceding the posting close date."  (Zabell Declaration, Ex. 14; McCaffrey Declaration, Ex. H.)

On October 9, 2012, plaintiff sent Hessel-Andor an email, requesting "some clarification" of the LIRR's policy. (Def. 56.1, ¶ 35; Pl. 56.1, ¶ 35; Zabell Declaration, Ex. 16; McCaffrey Declaration, Ex. I.)  In that email, which is included in Exhibit 16 to the Zabell Declaration and Exhibit I to the McCaffrey Declaration, plaintiff questioned whether the 12-month requirement applied to persons who had never applied for, but had been reassigned to, their current position.  Plaintiff implied that the 12-month requirement had not previously been applied to such individuals, stating: "I am not sure if you are aware, but it has been confirmed to me that there have been other managers in the same situation as this."  (Zabell Declaration, Ex. 16; McCaffrey Declaration, Ex. I.)  A week later, Hessel-Andor responded to plaintiff's email by forwarding a memorandum authored by Kathleen M, Meilick, the Senior Director of Human Resources. (Zabell Declaration, Ex. 16; McCaffrey Declaration, Ex. I.)  That memorandum, which is attached to the McCaffrey Declaration as Exhibit J, responded to plaintiff's "request for clarification" by providing two reasons for the decision not to interview plaintiff

for the LTM position.  First, Meilick elaborated on the explanation provided by Hessel-Andor, stating that the "LIRR's corporate policy on 'Filling MPA Positions'" required that she be in her current position for 12 months.  Second, the memorandum stated: "[S]ince you are currently on a performance improvement plan, you will not be considered for any career opportunity bulletins until you receive a 3.0 or better on your annual performance evaluation."  (*Id.*)

Plaintiff also did not receive an interview for the position of Manager of Customer Service and Terminal Operations. According to Mary L. Centauro, the Human Resources employee responsible for filling that position, plaintiff was ineligible for the same two reasons set forth in the Meilick memorandum: (1) she did not meet the 12-month requirement and (2) was on a PIP. (Declaration of Mary L. Centauro dated Jan. 15, 2016, ¶¶ 9, 12-13.)  However, there is no indication that plaintiff was ever contacted by Human Resources with respect to this application.

**_Fraser I_**

On November 21, 2012, plaintiff commenced *Fraser I*, which alleged gender discrimination and retaliation in violation of Title VII, the NYSHRL and the NYCHRL.  The complaint did not specify the retaliatory acts, alleging only that plaintiff had been "retaliated against by defendant on the basis of her lawful complaints to the Equal Employment Opportunity Commission

6

regarding the acts of gender discrimination to which plaintiff was subjected . . . ." (Complaint in *Fraser I*, ¶¶ 52, 56, 60.)

On January 3, 2013, before a responsive pleading was filed, plaintiff amended her complaint. The amended pleading added two new causes of action: one alleging a violation of the Equal Pay Act, 29 U.S.C. § 206(d), and another alleging a violation of New York Labor Law § 194. The allegations relating to the retaliation claims were unchanged.

**The Next Two Job Applications**

In September 2013 and January 2014, plaintiff again applied for positions within the LIRR's Transportation Services Department. In September 2013, she applied for a position as a Superintendent. (Def. 56.1, ¶ 90; Pl. 56.1, ¶ 90.) On October 21, 2013, Centauro, the Human Resources employee responsible for filling the Superintendent position, sent plaintiff a rejection letter. That letter, which is attached to the McCaffrey Declaration as Exhibit Q, stated, in pertinent part: "[W]e have determined that our needs can best be met with another candidate."

In January 2014, plaintiff again applied for the position of Manager of Customer Services and Terminal Operations. (Def. 56.1, ¶ 113; Pl. 56.1, ¶ 113.) On February 21, 2014, Centauro sent plaintiff a letter stating that she would not be offered an interview because "it has been determined that you do

not meet the requirements listed in the bulletin due to attendance." (McCaffrey Declaration, Ex. V.)

**The Second Charge**

On March 7, 2014, plaintiff filed charge of discrimination with the EEOC and the SDHR (hereafter, the "Second Charge"), alleging retaliation. The Second Charge — which is attached to the Zabell Declaration as Exhibit 5 and attached to the McCaffrey Declaration as Exhibit W — consists of a completed form and a five-page affidavit executed by plaintiff. The form itself does not provide any particulars regarding the retaliation, but refers the reader to the attached affidavit. The form does, however, specify that the retaliation occurred from September 27, 2013, to February 21, 2014.

The affidavit specifically alleges that plaintiff has been "retaliated against by being denied the opportunity to interview for available positions" for which she was qualified. (Plaintiff's Affidavit sworn Mar. 7, 2014 (attached to the Second Charge), ¶ 27.) The affidavit contains allegations concerning all four job applications discussed above. With respect to the application for Superintendent, the affidavit alleges that plaintiff's applied for the position on September 23, 2013; that the posting for the position closed on September 27, 2013; and that plaintiff "did not receive a response from Respondent regarding the status of this application." (*Id.*, ¶ 23.) The

affidavit contains no reference to Centauro's rejection letter to plaintiff dated October 21, 2013.

In contrast, the affidavit not only mentions, but quotes from, Centauro's letter dated February 21, 2014, in which Centauro stated that plaintiff was ineligible for the position of Manager of Customer Service and Termination Operations "due to attendance." (*Id.*, ¶ 25.) Plaintiff specifically alleges that "[t]his letter is false and pretextual." (*Id.*, ¶ 26.) Plaintiff claims that she was never informed that she had "attendance issues" and never received "any warning to that effect." (*Id.*)

**The Fifth Job Application**

On or about July 18, 2014, plaintiff applied for the position of Manager - Transportation Crew Management Services. (Def. 56.1, ¶ 142; Pl. 56.1, ¶ 142.) One week later, Lucille Marino, the Human Resources Business Manager responsible for filling the position, wrote to plaintiff, informing her that she would not be offered an interview. (Def. 56.1, ¶ 141; Pl. 56.1, ¶ 141; Zabell Declaration, Ex. 18; McCaffrey Declaration, Ex. AA.) The letter stated, in pertinent part: "We have reviewed your resume and work history and based on the information presented, it has been determined that you do not meet the requirements listed in the bulletin due to your attendance record." (Zabell Declaration, Ex. 18; McCaffrey Declaration, Ex. AA.)

**This Action**

On December 11, 2014, plaintiff commenced this action, alleging retaliation in violation of Title VII, the NYSHRL and the NYCHRL. The three causes of action allege that plaintiff was "retaliated against by defendant in response to her lawful complaints" to the EEOC, the SDHR, or both, and "the subsequent filing of her federal court lawsuit regarding the gender discrimination to which plaintiff was subjected . . . ." (Complaint, ¶¶ 42, 46, 50.) The causes of action themselves do not identify specific retaliatory acts.

The "Facts" section preceding the causes of action, however, specifically alleges that plaintiff was "unlawfully retaliated against by being denied the opportunity to interview for available positions for which she was qualified." (*Id.*, ¶ 39.) This section contains allegations relating to all five of the job applications discussed above: the July 7, 2012, application for LTM; the September 27, 2012, application for Manager of Customer Service and Terminal Operations; the September 23, 2013, application for Superintendent; the January 31, 2014, application for Manager of Customer Service and Terminal Operations and the July 15, 2014, application for Manager - Transportation Crew Management Services. With respect to the rejection of the first of these applications, the pleading alleges that plaintiff "was never provided an explanation as to what . . .

warranted her placement" on the PIP which, along with the 12-month requirement, prevented her from receiving an interview. The pleading alleges that plaintiff never received any response to the second and third applications. (*Id.*, ¶¶ 30, 32.) The pleading also alleges that the letters from Centauro and Marino, which alleged that plaintiff did not meet the requirements for the fourth and fifth positions "due to attendance," were "material false and pretextual." (*Id.*, ¶¶ 34, 38.)

**Defendant's Motion for Summary Judgment**

Defendant now moves for summary judgment, raising four points in its Memorandum of Law in Support of Defendant's Motion ("Defendant's Memo".) First, defendant argues that the claims relating to the two 2012 applications are time-barred because plaintiff did not file a charge of discrimination within 300 days of the allegedly retaliatory acts. Second, defendant argues that plaintiff cannot make out a prima facie case of retaliation because she cannot establish a causal connection between a protected activity and the rejection of plaintiff's five applications. Third, defendant asserts that it can establish legitimate reasons for denying all five applications. Finally, defendant argues that plaintiff cannot demonstrate that these reasons were pretextual.

In support of its arguments, defendant has submitted declarations from the LIRR personnel involved in rejecting

plaintiff's applications.  First, it has submitted a Declaration
of Tracy Hessel-Andor dated Jan. 5, 2016 (the "Hessel-Andor
Declaration"), in which Hessel-Andor states that she was unaware
of plaintiff's complaints of discrimination and retaliation at the
time she made the determination to deny plaintiff's July 7, 2012,
application, and that she reached her determination based solely
on LIRR's policies and procedures.  (Hessel-Andor Declaration, ¶¶
11, 13.)  Hessel-Andor cites to the LIRR's written "Policy for
Filling MPA Positions," and notes that § IV(F)(1) of this document
provides that "an employee must be in their current position for
twelve months before being eligible for a promotion and/or
reassignment."  (*Id*., ¶ 4.)

          Second, defendant has submitted a Declaration of
Kathleen M. Meilick dated Jan. 4, 2016 (the "Meilick
Declaration"), which describes what Meilick did in response to
plaintiff's October 9, 2012, email requesting clarification of the
first rejection.  Meilick states that she ascertained that
plaintiff was ineligible to apply for the LTM position not only
under § IV(F)(1), but also under § IV(F)(3), which requires that
an applicant have an "overall rating of 'Solid Performer' on her
most current performance appraisal."  (Meilick Declaration, ¶¶ 17,
20-21.)  Meilick found that plaintiff, who was on a performance
improvement plan, was ineligible under both §§ IV(F)(1) and
IV(F)(3) and advised her accordingly.  (*Id*., ¶ 23 (citing

McCaffrey Declaration, Ex. J.)) Meilick states that she was unaware of plaintiff's complaints of discrimination or retaliation at the time she made this determination. (*Id.*, ¶ 28.)

Third, defendant has submitted a Declaration of Mary L. Centauro dated Jan. 15, 2016 (the "Centauro Declaration"), in which Centauro states that she was unaware of plaintiff's complaints of discrimination and retaliation at the time she made the determination to deny plaintiff's September 23, 2013, application for Superintendent and her January 23, 2014, application for Manager of Customer Service and Terminal Operations. (Centauro Declaration, ¶¶ 37, 56.) Centauro states that plaintiff was not eligible to apply for either position "because she had excessive absences in two (2) of the previous three (3) years." (*Id.*, ¶¶ 26, 45.) The Centauro Declaration provides details regarding the number of sick days plaintiff took during the three-year period immediately preceding her September 23, 2013, and January 23, 2014, applications, and describes Centauro's efforts to ascertain that those absences were not authorized under the Family Medical Leave Act (the "FMLA") or excused by medical notes. (*Id.*, ¶¶ 24-25, 27-30, 43-44, 46-49.)

Fourth, defendant has submitted a Declaration of Lucille Marino dated Dec. 31, 2015 (the "Marino Declaration"), in which Marino states that she was unaware of plaintiff's complaints of discrimination and retaliation at the time she made the

determination to deny plaintiff's July 2014 application for the
position of Manager - Transportation Crew Management Services.
(Marino Declaration, ¶ 24.)  Marino states that plaintiff was
rejected for the position in light of an LIRR policy which
provides that an "employee who has 10 or more sick leave absences
. . . for which there is no approved Family Medical Leave . . . or
medical documentation in two (2) of the prior three (3) years" is
ineligible for a promotion.  (*Id.*, ¶ 4.)  The declaration details
the number of sick days plaintiff took during the three-year
period immediately preceding her July 2014 application, and
describes Marino's efforts to ascertain that those absences were
not authorized under the FMLA or excused by medical notes.  (*Id.*,
¶¶ 10-11, 14-17.)

     In addition, defendant has submitted the McCaffrey
Declaration, which attaches 29 exhibits.  The attachments include
transcripts of plaintiff's August 8, 2015, deposition and
Centauro's October 8, 2015, deposition; a copy of the MTA Policy
for Filling MPA Positions; plaintiff's attendance records, and
emails corroborating Centauro's and Marino's claims that they
checked for FMLA and medical documents.

     In her Memorandum of Law Submitted in Opposition to
defendant's Motion ("Plaintiff's Opposition"), plaintiff responds
to each of plaintiff's arguments.  In support of her Opposition,
plaintiff has submitted the Zabell Declaration, which attaches,

*inter alia*, transcripts of Meilick's September 15, 2015, deposition[1] and Marino's October 8, 2015, deposition. Plaintiff has replied to plaintiff's Opposition with a Reply Declaration in Support of Defendant's Motion (the "Reply Declaration") and six additional declarations. Some of the arguments and evidence contained in these documents is discussed below, to the degree that they are relevant to the issues to be decided.

## DISCUSSION

### I.  The Summary Judgment Standard

Summary judgment is appropriate only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[G]enuineness runs to whether disputed factual issues can reasonably be resolved in favor of either party, [while] materiality runs to whether the dispute matters, *i.e.*, whether it concerns facts that can affect the outcome under the applicable substantive law." *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 5 (2d Cir. 1999) (internal quotation omitted; brackets added).

Initially, the moving party bears the burden of demonstrating "the absence of a genuine issue of material fact."

---

[1]The copy of the Meilick Deposition transcript submitted to the court is poorly scanned, such that the last lines of each page are cut off. The court will nonetheless rely on the transcript, as neither party sought to submit a corrected version.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant meets this burden, the non-movant must then "set forth specific facts showing that there is a genuine issue for trial." *Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990) (internal quotation omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal citation and brackets omitted). Moreover, a party cannot sustain its burden in opposing summary judgment by relying on inadmissible hearsay evidence. *See G.I. Home Developing Corp. v. Weis*, 499 F. App'x. 87, 90 (2d Cir. 2012) (summary order).

When evaluating a motion for summary judgment, the court must construe the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences and resolving all ambiguities in his favor. *See Niagara Mohawk Power Corp. v. Jones Chem. Inc.*, 315 F.3d 171, 175 (2d Cir. 2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)); *see also Swartz v. Insogna*, 704 F.3d 105, 109 (2d Cir. 2013). No genuine triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury

could find in the non-movant's favor.  *See Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996).  "If the evidence presented by the non-moving party is merely colorable, or is not significantly probative, summary judgment may be granted."  *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (internal quotations and brackets omitted).

## II.  The Timeliness of the Retaliation Claims relating to Plaintiff's Two 2012 Job Applications

Point I of Defendant's Memo seeks to dismiss the retaliation claims arising from the rejections of plaintiff's July 7 and September 23, 2012, job applications on the ground that these claims are time-barred.  Defendant notes that 42 U.S.C. § 2000e-5(e) requires a claimant to file a charge of discrimination with the EEOC within 180 days of the alleged unlawful employment action or, if the claimant has already filed the charge with a state or local equal employment agency, within 300 days of the alleged discriminatory action.  Defendant argues that plaintiff did not file a charge of discrimination relating to the rejections of her two 2012 job applications until March 7, 2014 — more than a year after the allegedly retaliatory actions took place — and that plaintiff's Title VII retaliation claims relating to these two rejections should be dismissed.  (*See* defendant's Memo, p. 11.)

In her response, plaintiff concedes that the Title VII claims relating to the rejections of her 2012 job applications are "time-

barred for liability purposes . . . ."  (Plaintiff's Opposition,

p. 2.)  However, she argues that these two rejections may

nonetheless be considered as "evidence corroborating plaintiff's

otherwise timely Title VII claims."  *Id.* (citing, *inter alia*, *Jute*

*v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 176 (2d Cir. 2005)).

Defendant does not challenge this latter proposition.

Accordingly, though the Title VII retaliation claims arising from

the two 2012 rejections are dismissed as untimely, the court will

nonetheless consider the question of whether these rejections were

retaliatory acts which corroborate plaintiff's timely retaliation

claims.

## III.  The McDonnell-Douglas Framework

Title VII retaliation claims and state-law retaliation

claims are both analyzed pursuant to the *McDonnell Douglas*

burden-shifting framework.  *Littlejohn v. City of New York*, 795

F.3d 297, 315 (2d Cir. 2015); *Zann Kwan v. Andalex Group LLC*, 737

F.3d 834, 843 (2d Cir. 2013).  "Under the first step of the . . .

framework, the plaintiff must establish a prima facie case of

retaliation by showing (1) 'participation in a protected

activity'; (2) the defendant's knowledge of the protected

activity; (3) 'an adverse employment action'; and (4) 'a causal

connection between the protected activity and the adverse

employment action.'"  *Zann Kwan*, 737 F.3d at 844 (quoting *Jute*,

420 F.3d at 173).  "In determining whether this initial burden is

satisfied in a Title VII retaliation claim, the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Jute*, 420 F.3d at 173 (citing *Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 58 (2d Cir. 1987)).

"Once the plaintiff has established a prima facie showing of retaliation, the burden shifts to the employer to articulate some legitimate, non-retaliatory reason for the employment action." *Zann Kwan*, 737 F.3d at 845 (citing *Brennan*, 650 F.3d at 93). If the employer meets this burden, "the presumption of retaliation arising from the establishment of the prima facie case drops from the picture." *Id.* (citing *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000)). The plaintiff must then "point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation." *Cifra v. G.E. Co.*, 252 F.3d 205, 216 (2d Cir. 2001).

In addition, the plaintiff must show that "that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528 (2013). This causation standard "does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have

occurred in the absence of the retaliatory motive." *Zann Kwan*, 737 F.3d at 846. "A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." *Id*.

## IV.  The Lack of a Causal Connection

Point II of Defendant's Memo argues that plaintiff cannot make out a prima facie case of retaliation because she cannot establish a causal connection between a protected activity and the rejection of plaintiff's five applications.  First, defendant argues that a causal connection cannot be established by temporal proximity alone because the rejections of plaintiff's job applications were not very close in time to any protected activity.  Second, defendant argues that plaintiff lacks any direct evidence of the causal connection.

"Proof of causation can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon*, 232 F.3d at 117.  The Supreme Court has noted that "[t]he cases that accept mere temporal proximity between an employer's

knowledge of protected activity and an adverse employment action
as sufficient evidence of causality to establish a prima facie
case uniformly hold that the temporal proximity must be 'very
close.'" *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74
(2001) (citing *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th
Cir. 1997) (3-month period insufficient); *Hughes v. Derwinski*, 967
F.2d 1168, 1174-75 (7th Cir. 1992) (4-month period insufficient.))
However, the Second Circuit "has not drawn a bright line defining,
for the purposes of a prima facie case, the outer limits beyond
which a temporal relationship is too attenuated to establish
causation ...." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93,
110 (2d Cir. 2010.)

    The lack of a bright-line rule has allowed the Second
Circuit "to exercise its judgment about the permissible inferences
that can be drawn from temporal proximity in the context of
particular cases." *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir.
2009).  In *Hollander v. American Cyanamid Co.*, 895 F.2d 80 (2d
Cir. 1990), for example, the court concluded that evidence that a
defendant took an adverse employment action against the plaintiff
three months after he filed his EEOC complaint was insufficient to
establish a causal connection. *Id*. at 85-86.  Under other
circumstances, however, the court has found that lapses of six,
seven, or even eight months were not too long to establish a
causal connection. *See Espinal v. Goord*, 558 F.3d 119, 129 (2d

Cir. 2009) ("[T]he passage of only six months between the dismissal of Espinal's lawsuit and an allegedly retaliatory beating by officers ... is sufficient to support an inference of a causal connection); *Summa v. Hofstra Univ.*, 708 F.3d 115, 128 (2d Cir. 2013) ("The seven-month gap between Summa's filing of the instant lawsuit and the decision to terminate her employment privileges is not prohibitively remote" and sufficient "in this instance to permit a reasonable jury to find causation."); *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 46 (2d Cir. 1980) (finding causation based on an eight-month lag between protected activity and adverse action).

In the cases in which there have been relatively lengthy gaps between the protected activity and the adverse employment action, however, there has generally been other evidence to suggest retaliation. In *Espinal*, the court noted one of the plaintiff's assailants was a defendant in the lawsuit that allegedly prompted the retaliation. 558 F.3d at 129. In *Summa*, the court noted that the person who decided to terminate the plaintiff's employment privileges had "personal knowledge of the lawsuit" and made comments implying that the protected activity played a part in the decision. 708 F.3d at 128. In *Grant*, the defendants advanced either "transparent pretexts" for the allegedly retaliatory actions or offered no reasons whatsoever for their actions. 622 F.2d at 46.

In this case, none of the five rejections very closely followed any protected activity. The first rejection—that of plaintiff's July 7, 2012, application for the LTM position—was Hessel-Andor's letter dated September 28, 2012, which informed plaintiff that she would not be interviewed for the LTM position. That letter was written over seven months after plaintiff filed her Charge with the SDHR.

There is no evidence that plaintiff ever received a formal rejection of her second application — her first application for the position of Manager of Customer Service and Terminal Operations. Plaintiff testified that she had no reason to believe that her application was rejected because of her complaint of discrimination or retaliation. (Pl. Dep. at 60:12.) However, plaintiff did not make that application until September 27, 2012, exactly seven months after she filed her Charge with the SDHR. Even if the court were to assume that Hessel-Andor's September 28, 2012, letter implied a rejection of all claims made during the one-year period following plaintiff's April 2012 reassignment, the rejection would be over seven months after the most recent protected activity.

The third rejection — that of plaintiff's September 2013 application for a position as Superintendent — was in a letter sent by Centauro on October 21, 2013. That letter was mailed approximately 9.5 months after plaintiff filed her amended

complaint in *Fraser I*.  There is no evidence that plaintiff
engaged in any other protected activity during this 9.5 month
period.

The fourth rejection — that of plaintiff's January 2014
application for the position of Manager of Customer Services and
Terminal Operations — came in the form of Centauro's February 21,
2014, letter stating that plaintiff would not be offered an
interview "due to attendance."  (McCaffrey Declaration, Ex. V.)
This letter was sent more than 13 months after plaintiff filed her
amended complaint in *Fraser I*.  There is no evidence that
plaintiff engaged in any other protected activity during this 13-
month period.

The final rejection — of plaintiff's July 18, 2014,
application for the position of Manager - Transportation Crew
Management Services — was sent by Marino on July 25, 2014.  That
rejection letter was sent over 4.5 months after plaintiff filed
her Second Charge with the EEOC.

Apart from purported temporal proximity ranging between
4.5 to thirteen months between the protected activity and the
rejection, plaintiff has provided no evidence of a causal
connection between the protected activity and the job rejections.
Furthermore, although "[t]he temporal proximity of events may give
rise to an inference of retaliation for the purposes of
establishing a *prima facie* case of retaliation under Title VII,

24

[]without more, such temporal proximity is insufficient to satisfy appellant's burden to bring forward some evidence of pretext." *Dixon v. Int'l Fed'n of Accountants*, 416 F. App'x 107, 110-11 (2d Cir. 2011) (quoting *El Sayed v. Hilton Hotels Corp.,* 627 F.3d 931, 933 (2d Cir. 2010) (*per curiam*)). Here, plaintiff has submitted no evidence of pretext, and this case is distinguishable from other cases involving temporal proximity between protected activity and alleged retaliation. Unlike in *Espinal*, the Human Resources personnel who rejected plaintiff's applications were not themselves the subject of the protected activity. Unlike in *Summa*, the persons responsible for the retaliatory acts had no personal knowledge of plaintiff's complaints of discrimination or retaliation at the time they decided to reject each of the applications. (*See* Hessel-Andor Declaration, ¶ 13; Meilick Declaration, ¶ 28; Centauro Declaration, ¶¶ 37 & 56, and Marino Declaration, ¶ 24.) Unlike in *Grant*, defendant has provided detailed, legitimate reasons for denying plaintiff's job applications.

Under these circumstances, no reasonable factfinder could infer a causal connection between the protected activity and at least the first four of the five rejections. The seven-month gaps between the protected activity and the first two rejections strain the outer limits beyond which a temporal relationship is too attenuated to establish causation. The 9.5-month and 13-month

gaps between the protected activity and the third and fourth rejections exceed the outer limits. Moreover, in none of these cases is there is any other circumstantial evidence to support the inference of a causal connection or any direct evidence of retaliatory animus.

## V. Defendant's Legitimate, Non-Pretextual Reasons for the Job Rejections

### A. The First Two Applications

Even assuming that plaintiff could establish a causal connection between protected activity and all five allegedly retaliatory rejections based on temporal proximity alone, plaintiff has not established that defendant's reasons for the rejections were pretextual. Defendant has provided evidence that the first two applications were rejected pursuant to two provisions in the LIRR's "Policy for Filling MPA Positions" which dictate when an employee can be considered for such a position. The first provision, set forth in § IV(F)(1), states:

> Employees must meet the minimum qualification requirements and be in their present position for a minimum of one year as of the closing date of the posting. In unusual cases, the hiring Department Head may request a waiver to consider an employee with less than one year in his/her current position, subject to the approval of the Executive Director - Human Resources and concurrence of the current Department Head, if applicable.

The second provision, contained in § IV(F)(3), states:

> MPA applicants must have a current performance
> appraisal (within the past year) on file with
> Human Resources with an overall rating of
> "solid Performer" or better.

Plaintiff does not dispute that this policy was applicable to her applications. Rather, she maintains that her involuntary reassignment might constitute an "unusual circumstance" and that Human Resources did not contact plaintiff's Department Head. Plaintiff characterizes this failure as a "conspicuous departure from a purportedly established policy," which precluded any "possibility Ms. Fraser could receive such a waiver." (Plaintiff's Opposition, p. 11.)

Plaintiff's arguments are unpersuasive. First, § V(F)(1) itself does not carve out an exception for employees who are in their current position because of an involuntary reassignment. Second, although plaintiff has adduced evidence suggesting that an involuntary reassignment might be considered an "unusual circumstance" in some instances, *see* Centauro Deposition, p. 21-22, § IV(F)(1) expressly states that the hiring Department Head must request a waiver. There is no evidence that plaintiff's Department Head did so in this case.

Hessel-Andor and Meilick did not contact the Department Head themselves, but there is no evidence that LIRR policy required them to do so. In arguing that such a policy exists, plaintiff cites to a portion of the Centauro Deposition in which Centauro was asked: "If an employee is reassigned without applying

for another position, would that qualify as an unusual circumstance where the twelve month or more requirement would be waived?" (Centauro Deposition, p. 21-22.) Centauro responded, "I guess each case would be looked at." (*Id.*, p. 22.) Nothing in this testimony suggests that Human Resources was required to be proactive in cases in which unusual circumstances might arguably exist. Indeed, defendant has supplied evidence to the contrary. According to declarations from Centauro and Meilick, "it is the responsibility of the hiring department to seek a waiver of the one year requirement." (Declaration of Kathleen M.Meilick dated Aug. 15, 2016, ¶ 13; Declaration of Mary L. Centauro dated Aug. 10, 2016, ¶ 13.)

Morever, there is no admissible evidence that Human Resources ever contacted Department Heads on behalf of other MPA applicants or evidence that Human Resources' failure to contact the Department Head was deliberate and motivated by retaliatory animus. At most, plaintiff has introduced double hearsay evidence that a Mr. Grippaldi told her that some unnamed Human Resources representative once told him that he could apply for a position within one year of an involuntary reassignment. (Plaintiff's Deposition, pp. 44.) However, plaintiff did not know if Grippaldi had ever actually made such application and could not "say specifically" that she knew of any other LIRR employee who

obtained a new position despite being in his or her current position for less than one year.  (*Id*., p. 45.)

Furthermore, there is absolutely no evidence that plaintiff's Department Head would have granted her a waiver if only he had been asked.  After all, the Chief Transportation Officer himself had reassigned plaintiff and placed her on a PIP in April 2012.  If plaintiff thought there was any possibility that her Department Head would have agreed to waive the 12-month requirement, she could have asked for the waiver herself.  In fact, it is undisputed that plaintiff did not tell anyone in the Transportation Department that she was applying for the position of LTM.  (Def. 56.1, ¶ 23; Pl. 56.1, ¶ 23.)

In addition to being ineligible for the position under § IV(F)(1), plaintiff was ineligible under §IV(F)(3.)  Plaintiff does not dispute the fact that she was on a PIP at the time she made the first two applications, but argues only that the Chief Transportation Officer acted improperly in placing her on a PIP. Assuming that the PIP was improper, the fact remains that she was on a PIP at the time her applications were rejected and that this designation rendered her ineligible for the jobs.  Plaintiff's assertions that the Chief Transportation Officer's determination was based on "half-truths," (*see* Zabell Declaration, Ex. 16, p.1), did not change that fact.  Meilick's unwillingness to meet with

plaintiff to hear her complaints do not imply retaliation for any protected activity.

### B.  The Remaining Three Applications

Defendant has produced evidence that the remaining three applications were rejected pursuant to a policy which renders an employee "who has 10 or more sick leave absences . . . for which there is no approved Family Medical Leave . . . or medical documentation in two . . . of the prior three years . . . ineligible for a promotion."  (Centauro Declaration, ¶ 5.)  With respect to plaintiff's September 2013 application for a position as Superintendent, defendant has adduced evidence that Centauro checked plaintiff's attendance reports and determined that she had been absent for over 20 sick days in 2012, and over 17 sick days during the period from January 1 to October 25, 2013.  (Centauro Declaration, ¶¶ 24-25.)  With respect to plaintiff's January 2014 application for Manager of Customer Service and Terminal Operations, defendant has produced evidence to show that plaintiff took over 28 sick days during the period from February 20, 2012, to February 19, 2013, and 14 sick days from February 20, 2013, to February 19, 2014. (*Id*., ¶¶ 43-44.)  With respect to plaintiff's July 2014 application for the position of Manager - Transportation Crew Management Services, defendant has introduced evidence that plaintiff took 21 sick days in calendar year 2012 and 22 sick days in calendar year 2013.  (Marino Declaration, ¶¶ 10-11.)

To determine whether plaintiff's sick days were excused, both Centauro and Marino checked with the Human Resources representative responsible for monitoring attendance and FLMA leave. (Centauro Declaration, ¶¶ 27, 46; Marino Declaration, ¶ 14.) After learning from the Human Resources attendance representative that none of the absences were excused, Centauro and Marino then contacted the LIRR's Medical Department and ascertained that there were no medical notes excusing any of the absences. (Centauro Declaration, ¶¶ 29-30, 48-49; Marino Declaration, ¶¶ 16-17.) Neither Centauro nor Marino contacted the Transportation Department itself regarding medical documentation. Centauro claimed that it was not the custom or practice of the Human Resources Department to do so, (Centauro Declaration, ¶¶ 31, 50,) and Marino claimed that it was not her practice to do so. (Marino Declaration, ¶ 14.)

Plaintiff does not question that her attendance records show that she took more than 10 sick days in 2012 and 2013, or that Centauro and Marino contacted the Human Resources representative in charge of attendance records and the LIRR Medical Department. Rather, plaintiff has introduced evidence that she provided the Transportation Department with medical notes excusing 18 of her absences in 2012. Specifically, plaintiff testified at her deposition that she or her husband gave various medical notes to Gale Scaglia, Melissa Novell and Susan Davis, who

were clerks or secretaries in the Transportation Department. (Plaintiff's Deposition, pp. 76-85.) Plaintiff concedes, however, that she has no knowledge of what these individuals did with the notes and, accordingly, no way of knowing whether Centauro and Marino ever saw them. (*Id*.)

To be sure, plaintiff has established that there is a genuine issue of fact as to whether Centauro and Marino were required to contact the Transportation Department regarding the existence of medical notes. At her deposition, Centauro testified that at the time she reviewed plaintiff applications, it was not Human Resources' practice to contact the employee's department. (Centauro Deposition, pp. 25, 36.) Gale Scaglia corroborates this, stating that she never received any Human Resource requests for medical documentation from 2010, when Human Resources developed an "attendance record management system," until 2015, when she retired. (Declaration of Gale Scaglia dated Aug. 5, 2016, ("Scaglia Declaration"), ¶¶ 7-8.) Meilick, however, contradicts this, stating that a Human Resources recruiter would usually contact the employee's department for medical records. (Meilick Deposition, ¶¶ 29, 86.)

There is no need to resolve or consider this factual dispute, however, because it is not material. Even assuming that Centauro and Marino should have contacted the Transportation Department, there is no question that they failed to do so and did

not learn of plaintiff's medical notes.  Centauro, Marino and
Scaglia all testified that there was no communication between
Human Resources and the Transportation Department.  (Centauro
Declaration, ¶¶ 31, 50; Marino Declaration, ¶ 14; Scaglia
Declaration, ¶ 8.)  The decisions to deny plaintiff applications
"due to attendance" may have been based on incomplete information
and mistaken, but they were rooted in established LIRR policy.
"[E]vidence that the decision was objectively incorrect, does not
necessarily demonstrate, by itself, that the employer's proffered
reasons are a pretext for termination."  *Moore v. Kingsbrook
Jewish Med. Ctr.*, No. 11-CV-3625 (MKB), 2013 WL 3968748, at *13
(E.D.N.Y. July 30, 2013) (quoting *Grant v. Roche Diagnostics
Corp.*, No. 09-CV-1540, 2011 WL 3040913, at *11 (E.D.N.Y. July 20,
2011, and *Kalra v. HSBC Bank USA, N.A.*, 567 F. Supp. 2d 385, 397
(E.D.N.Y. 2008)).  Accordingly, plaintiff's proof that Centauro
and Marino were incorrect in rejecting her applications does not
establish that the reasons provided by defendant for those reasons
were pretexts for retaliation.

## IV.  *The NYCHRL Claims*

A district court "may decline to exercise supplemental
jurisdiction over a claim . . . [if] . . . the district court has
dismissed all claims over which it has original jurisdiction[.]"
28 U.S.C. § 1367(c)(3).  Although "[t]he exercise of supplemental
jurisdiction is within the sound discretion of the district

court," *Lundy v. Catholic Health Sys. of Long Isl. Inc.*, 711 F.3d 106,117 (2d Cir. 2013), the Second Circuit has stated that if a plaintiff's federal claims are dismissed before trial, pendant state and city claims should be dismissed as well. *See Brzak v. United Nations*, 597 F.3d 107, 113-14 (2d Cir. 2010) (quoting *Cave v. E. Meadow Union Free Sch. Dist.*, 514 F.3d 240, 250 (2d Cir. 2008)). This rule is consonant with the Supreme Court's observation that when "all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise [supplemental] jurisdiction . . . ." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7 (1988).

For the reasons stated above, the court grants summary judgment with respect to plaintiff's Title VII and NYSHRL retaliation claims. However, the court declines to exercise supplemental jurisdiction over plaintiff's NYCHRL retaliation claim. *See Brzak*, 597 F.3d at 113-14. The court will dismiss this third cause of action without prejudice to pursuing it in State court.

## CONCLUSION

For the reasons stated above, defendant's motion for summary judgment is granted with respect to plaintiff's first and second causes of action, alleging retaliation under Title VII and

the NYSHRL.  The court declines to exercise supplemental

jurisdiction over the third cause of action, which is dismissed

without prejudice to pursuing it in State court.  The Clerk of

Court is directed to enter judgment for defendant in accordance

with this Memorandum and Order and to close this case.

**SO ORDERED.**

_____/s/_____
KIYO A. MATSUMOTO
United States District Court

Dated: March 31, 2018
       Brooklyn, New York